Gregory Zimmer, Esq.
360 Lexington Avenue, Suite 1502
New York, NY 10017
Tel: (914) 402-5683
GZimmer@GZimmerLegal.com

N. Ari Weisbrot, Esq. (NW-6029)
LAW OFFICE OF N. ARI WEISBROT LLC
1099 Allessandrini Avenue
New Milford, New Jersey 07646
Tel: (201) 788.6146
Email:  aweisbrot@weisbrotlaw.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Michael M. Goldberg, derivatively on behalf of Macrophage Therapeutics, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Claudine Bruck, Y. Michael Rice and Jed Latkin,<br><br>Defendants. | Case No.: _____<br><br><br><br>**COMPLAINT** |

Plaintiff Michael M. Goldberg, M.D. ("Dr. Goldberg") derivatively on behalf of Macrophage

Therapeutics, Inc. ("Macrophage") (in such derivative capacity, "Plaintiff"), by and through the

undersigned counsel, as and for his Complaint, derivatively on behalf of Macrophage, against

Claudine Bruck ("Bruck"), Y. Michael Rice ("Rice") and Jed Latkin ("Latkin"), alleges as follows:

### INTRODUCTION

1.     Through this action Plaintiff seeks damages and injunctive relief on behalf of

Macrophage against Bruck, Rice and Latkin to reverse the effects of, and compensate Macrophage

for a scheme conceived by non-party Navidea Biopharmaceuticals, Inc. ("Navidea") and implemented by Bruck, Rice and Latkin from within Macrophage to strip Macrophage of its assets for the benefit of Navidea.

2.      Macrophage was created in 2015 to separate efforts to develop therapeutic treatments for diseases from Navidea, whose core mission is to develop medical diagnostic agents.  In August 2018 Macrophage and Navidea entered into a contractual agreement (the "August Agreement") which further separated Macrophage and Navidea and their respective operations.  Prior to August 2018 Navidea owned one hundred percent (100%) of Macrophage's common voting stock (but not its preferred stock) and had the right to appoint a majority (2) of Macrophage's directors.  Navidea and Macrophage were run by Dr. Goldberg, who was the Chief Executive Officer ("CEO") of both companies and sat on the boards of directors of both companies (Dr. Goldberg was appointed to the Macrophage board by its preferred shareholders, not Navidea).

3.      The August Agreement required Macrophage to issue to Dr. Goldberg ownership of five percent (5%) Navidea's common stock and provided that Dr. Goldberg would resign as CEO and as a director of Navidea and would assume voting and board control of Macrophage.  It was agreed that Dr. Goldberg would remain CEO of Macrophage and would run Macrophage independently of Navidea.  The August Agreement also required Navidea to provide up to $750,000 to cover Macrophage's working capital requirements for a period of six (6) months from the closing of the transaction (the "Working Capital Line").

4.      However, after August 2018 Navidea embarked on a plan to loot Macrophage of its assets for Navidea's own benefit, directing Bruck, Rice and Latkin, who were (and still are) Navidea directors (Bruck and Rice) and officers (Latkin) to perpetrate its scheme.  Navidea purported to install Bruck and Rice as a majority of the directors of Macrophage.  Once in place, Navidea directed

Bruck and Rice to ignore their duties to Macrophage and promote Navidea's interests from within Macrophage. Bruck and Rice willingly did Navidea's bidding in breach or their fiduciary duties to Macrophage and its shareholders other than Navidea.

5.    Specifically, Bruck and Rice were directed (i) not to draw on the Working Capital Line (ii) to abandon claims to a grant from the National Institutes of Health (the "NIH Grant") that was to be allocated between Navidea and Macrophage and allow Navidea to convert the entire NIH Grant for its own use, (iii) acquiesce in Navidea's failure to meet its pre-existing obligations to fund certain Macrophage research and development efforts and (iv) not to pursue any other avenue of financing for Macrophage's operations. Bruck and Rice also failed to familiarize themselves with Macrophage's work or its financial situation. This was part of a concerted effort directed by Navidea and implemented by Bruck and Rice to contrive a purported "insolvency" at Macrophage and to strip Macrophage of its valuable intellectual property and other assets.

6.    As a result of Bruck and Rice's failure and refusal to access the Working Capital Line or NIH Grant funds or obtain any other form of financing for Macrophage (all at the direction of Navidea), Navidea purported to terminate a sublicense of certain intellectual property that it had entered into with Macrophage at Macrophage's inception (the "Sublicense") based on a purported insolvency of Macrophage when, in fact, Macrophage had ample access to both the Working Capital Line and the NIH Grant to satisfy its current financial obligations and had significant prospects for securing additional investment and/or financing based in its promising research and development work. At Navidea's direction, Bruck and Rice caused Macrophage to acquiesce in Navidea's termination of the Sublicense even though Macrophage was not insolvent and any financial issues that did exist at Macrophage were the sole result of Bruck and Rice's implementation of Navidea's scheme to create the appearance of insolvency.

3

7.     Following the termination of the Sublicense, Navidea directed Bruck and Rice to appoint Navidea's CEO, Latkin, as CEO of Macrophage.  Bruck and Rice complied with Navidea's request.  Bruck, Rice and Latkin then proceeded to terminate Macrophage's research, development and testing work and transfer all of Macrophage's valuable intellectual property to Navidea, all at Navidea's direction and to the detriment of Macrophage.

8.     Each of these acts constituted breaches of the fiduciary duties Bruck, Rice and Latkin owed to Macrophage while acting in the roles of directors and officers of Macrophage.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper pursuant to 28 U.S.C. §1332.  Upon information and belief, this action is between citizens of different states and the amount in controversy exceeds $75,000.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391((b)(1).

## THE PARTIES

11.     Dr. Goldberg is an individual and a resident of the State of New Jersey.  Dr. Goldberg is an owner of a significant equity interest in Macrophage.  The issue whether Dr. Goldberg is the owner of Super Voting Common Stock in an amount equal to five percent (5%) of the outstanding shares of Macrophage as of August 14, 2018, or owns forty percent (40%) of Macrophage's Series A Convertible Stock and forty percent (40%) of Macrophage's Series A Warrants is the subject of the civil action captioned *In re Navidea Biopharmaceuticals Litigation*, Case No.: 1:19-cv-01578-VEC, currently pending in the United States District Court for the Southern District of New York (the "NY Direct Action").  However, it is undisputed that Dr. Goldberg is an owner of a significant equity interest in Macrophage.

12.     Plaintiff Macrophage is a corporation organized and existing under the laws of the state of Delaware and having its principle place of business in Ohio.

4

13.     Upon information and belief, defendant Claudine Bruck is an individual and a citizen of the State of Pennsylvania.

14.     Upon information and belief, defendant Y. Michael Rice is an individual and a citizen of the State of New Jersey.

15.     Upon information and belief, defendant Jed Latkin is an individual and a citizen of the State of New York, New York County.

## BACKGROUND FACTS

### Dr. Goldberg

16.     Dr. Goldberg is a licensed physician and has a Master of Business Administration from Columbia University.  He has extensive experience in both medical research and development, focusing on therapeutics, and in business and finance, including the development of therapeutic drugs and the financing of medical development companies.  Dr. Goldberg has served on the boards of directors and special committees of numerous private and public companies.

17.     Prior to August 14, 2018 Dr. Goldberg was a member of Navidea's board of directors and was Navidea's CEO.

18.     Dr. Goldberg provided forty percent (40%) of Macrophage's initial funding in exchange for forty percent (40%) of Macrophage's Class A Convertible Preferred Stock ("Preferred Stock") and forty percent (40%) of Macrophage's Class A Warrants ("Warrants").

19.     In his capacity as a holder of forty percent (40%) of Macrophage's Class A Preferred Stock and Warrants, and pursuant to a Securities Purchase Agreement between Dr. Goldberg and non-party Platinum-Montour Live Sciences, LLC as purchasers of all of Macrophage's Class A Preferred Stock, on the one hand, and Macrophage, on the other hand (the "SPA"), Dr. Goldberg

served as a director on Macrophage's board of directors representing Macrophage's preferred shareholders beginning on or about March 11, 2015.

20.     Dr. Goldberg was Macrophage's President and Chief Executive Officer beginning on or about March 11, 2015.

**Navidea**

21.     Navidea is a publicly traded corporation listed on the New York Stock Exchange.

22.     Navidea's focus is on the development of immuno-targeted products designed to help identify the sites and pathways of undetected disease and enable better diagnostic accuracy, clinical decision-making, targeted treatment and, ultimately, patient care.

23.     Navidea focuses on the development of innovative immunodiagnostic agents.

24.     Prior to August 14, 2018 Dr. Goldberg was a member of the Board of Directors of Navidea and Navidea's Chief Executive Officer.

25.     Prior to in or about February 2019 Dr. Goldberg was the largest single shareholder of Navidea.

26.     Prior to August 14, 2018 Dr. Goldberg held essentially all of Navidea's outstanding debt.

**Macrophage**

27.     Macrophage was incorporated in January 2015 to seek and develop therapeutic treatments for cancer, cardiovascular, autoimmune, antiviral and brain diseases.

28.     Macrophage was created and operated to separate therapeutic research and development from Navidea's core business of development of diagnostics.

29.     It was determined this separation of therapeutic research, development and commercialization would inure to the benefit of both Macrophage, which would be free to develop

6

therapeutic applications independently of Navidea and pursue independent financing for therapeutic applications and research, and the benefit of Navidea which owned Macrophage's common stock and would benefit from the value created at Macrophage.

30.     This separation between therapeutics and diagnostics was agreed to by Macrophage and made binding on Macrophage in the SPA, in which it was agreed that any therapeutic applications of the Licensed IP (as defined herein) would be conducted and commercialized exclusively through Macrophage.

31.     When Macrophage was incorporated Navidea owned one hundred percent (100%) of Macrophage's common stock.

32.     Macrophage's operations and scientific development and testing work was conducted separately from Navidea's.

33.     As a wholly owned subsidiary of Navidea, Navidea consolidated Macrophage's operations and financial results with Navidea's for accounting and reporting purposes.

34.     However, Navidea allocated expenses and revenues among Navidea and Macrophage and all expenses incurred by Macrophage were charged to Macrophage and allocated and charged to Macrophage as a separate company.

35.     The Macrophage board of directors was originally composed of Dr. Goldberg and two individuals appointed by Navidea.

36.     Eventually, the two Navidea appointees and a third director appointed by Navidea were removed or resigned from the Macrophage board and beginning in or about April 2018 and through November 2018 the Macrophage board consisted of Dr. Goldberg and Dr. Mark Greene ("Dr. Greene").

37.     Dr. Greene is an accomplished physician and medical researcher.   He was an assistant professor at Harvard University and Harvard Medical School and has held prestigious positions at the University of Pennsylvania since 1989.  Dr. Green has had a long career as a research scientist and fellow and his research has led to the development and commercialization of the first therapeutic antibody for the treatment of cancer.

38.     Dr. Green served as a director on Macrophage's board of directors until November 29, 2018.

39.     It is undisputed that until November 29, 2018 Dr. Goldberg and Dr. Greene comprised the entire Board.

40.     Dr. Goldberg was the CEO of Macrophage from its inception.

**The Sublicense**

41.     In January 2015 Navidea owned or controlled certain patents, patent applications, know-how, trade secrets and other proprietary rights related to devices and drugs for therapeutic and diagnostic purposes (the "Navidea IP").

42.     In January 2015 Navidea was the exclusive licensee of certain patent rights developed by The Regents of the University of California ("UC") and was the non-exclusive licensee of certain know-how as developed by UC (the "UC IP" and, together with the Navidea IP, the "Licensed IP").

43.     In January 2015, concurrent with the formation of Macrophage and the SPA, Navidea entered into a Sublicense Agreement (the "Sublicense") with Macrophage, effective as of March 11, 2015, pursuant to which Navidea licensed to Macrophage the exclusive right to use and sublicense the Licensed IP to commercialize therapeutic applications for the Licensed IP.

44.     The Sublicense did not require Macrophage to provide to Navidea detailed descriptions of research or testing being performed by Macrophage or to disclose to Navidea confidential information concerning such research or testing, including test results.

45.     The Sublicense granted Navidea a license to use any enhancements, modifications, corrections, inventions, changes or innovations made by Macrophage to the inventions claimed in the Licensed IP ("Improvements"), but only outside the field of therapeutics.

46.     Thus, the Sublicense did not give Navidea access to detailed information concerning Macrophage's efforts to develop therapeutic applications for the Licensed IP.

47.     And while the Sublicense did give Navidea a license to use any Improvements developed by Macrophage for imaging, it precluded Navidea from using either the Licensed IP or the Improvements in the field of therapeutics and, thereby, precluded Navidea from competing with Macrophage in the field of therapeutics.

48.     The Sublicense was to expire when the patents underlying the Licensed IP expired in or about May 2020.

49.     The Sublicense permitted Navidea to terminate the Sublicense early only if Macrophage materially breached the Sublicense and failed to cure such breach, if Macrophage became insolvent, or if Macrophage initiated or assisted in a challenge to the patents underling the Licensed IP (any such event a "Termination Event").

50.     If the Sublicense expired according to its terms, the prohibition on Navidea using the Licensed IP and any Improvements in the field of therapeutics continued in perpetuity.

51.     If Navidea terminated the Sublicense due to the occurrence of a Termination Event, then Macrophage would be required to assign to Navidea all of Macrophage's rights, title and interest in any Improvements created by Macrophage and the restrictions on Navidea's using the

Licensed IP or any Improvements in the field of therapeutics would no longer apply and Navidea would be permitted to continue any ongoing research.

52.     As consideration for the Sublicense, Macrophage granted to Navidea 100% of its common stock.

**Macrophage's Operations**

53.     Dr. Goldberg was responsible for providing creative and operational direction to Macrophage.

54.     Dr. Goldberg was solely responsible for driving innovation, research, development and testing of therapeutic drugs at Macrophage.

55.     Dr. Goldberg lent his extensive education, experience and knowledge to the development of therapeutic drugs on behalf of Macrophage.

56.     Dr. Greene sat on Macrophage's Scientific Advisory Board ("SAB") as well as its board of directors from Macrophage's inception and later was appointed to Navidea's board of directors.

57.     Beginning in 2015 Dr. Green contributed his extensive background, knowledge and experience in the field of cancer treatment to Macrophage and spearheaded Macrophage efforts to develop therapeutic treatments for cancer which were yielding promising results.

58.     Dr. Goldberg conceived a new way to use targeting technology to deliver therapeutic drugs, rather than for the imaging purposes that Navidea has been pursuing.

59.     Dr. Goldberg formulated a means to deliver a specific cancer treatment drug using the targeting technology that was developed by Macrophage.

60.     Dr. Goldberg also conceived of and reduced to practice an anti-inflammatory family of products to create an entirely new class of highly targeted anti-inflammatory drugs.

61.     These types of therapeutic drugs offered promising potential treatments for wide-spread diseases and were potentially far more valuable than the diagnostic agents being developed by Navidea.

62.     As CEO of Macrophage, Dr. Goldberg arranged with various third parties, including medical facilities and research doctors, to manufacture the therapeutic drug products developed by Macrophage and to carry out animal testing of the drug products.

63.     He also identified and attracted world class scientists to collaborate with and advise Macrophage.

64.     Chemist Jeff Arnold ("Arnold") produced research-grade drug products developed by Macrophage to be used in animal testing projects.

65.     The Salzman Group was engaged to develop the scale up methods required to make sufficient quantities of the drug products developed by Macrophage to complete preclinical and clinical testing of Macrophages drug candidates.

66.     Macrophage used animal testing models to ascertain the efficacy of the drug products in development and to determine which drug products were suitable to advance to human testing.

67.     Macrophage had existing animal testing projects in place with New York Medical College ("NYMC").

68.     Dr. Nai Fang Wang ("Dr. Wang") of Align Biomedical was testing Macrophage anti-inflammatory agents in a number of animal testing models at the NYMC.  The data supplied by Align Biomedical indicated that the Macrophage drugs were producing promising results.

69.     Macrophage had existing animal testing projects in place with the University of Connecticut.

70.     Dr. Green was also conducting laboratory testing of cancer treatment drugs at his laboratories at the University of Pennsylvania.

**The Macrophage IP**

71.     The work performed by Macrophage in developing, manufacturing, scaling-up and testing various therapeutic drugs resulted in Macrophage developing significant knowledge, know-how, confidential information, trade secrets and potentially patentable inventions and other intellectual property with very significant value, all of which are the intellectual property of Macrophage (the "Macrophage IP").

72.     A portion of the Macrophage IP comprised Improvements on the Licensed IP, which, under the terms of the Sublicence, Macrophage had the exclusive right to exploit, commercially or otherwise, in the field of therapeutics.

73.     Under the Sublicense, Navidea had a license to use the Improvements in fields other than therapeutics but had no right to use them in the field of therapeutics or to license or otherwise exploit them.

74.     A portion of the Macrophage IP was independent of the Licensed IP and therefore Macrophage had the exclusive right to exploit it, commercially or otherwise, for any purpose, without any limitations.

75.     Navidea had no right to learn of or use the Macrophage IP that did not comprise Improvements.

76.     The Sublicense had limited value to Macrophage, especially in 2018 and 2019 because the patents underlying the Licensed IP were set to expire in or about May 2020.

77.     Because Macrophage did not have drug candidates that were likely to be at the commercialization stage before March 2020, there was no significant competitive advantage to

Macrophage having a license to use (and commercialize) the Licensed IP because once the patents expired all of Macrophage's competitors would also have access to and the right to commercialize the patents (but not Macrophage's Improvements or any other part of the Macrophage IP).

78.     The Sublicense would expire along with the patents underlying the Licensed IP in or about May 2020.

79.     However, the Macrophage IP (both that created based on the Licensed IP and therefore comprising Improvements and the other non-Improvements Macrophage IP) had significant value to Macrophage, especially because it was all confidential to Macrophage.

80.     The Macrophage IP gave Macrophage a significant advantage in the development of therapeutic drugs, and although Navidea had access to and a license to us a portion of it (the Improvements) outside the field of therapeutics, even Navidea could not utilize the Macrophage IP to compete with Macrophage in therapeutics or disclose or license it to potential competitors.

81.     Macrophage and its directors and officers had a fiduciary duty to preserve the confidentiality of the Macrophage IP.

82.     Macrophage and its directors and officers had a fiduciary duty to preserve the value of the Macrophage IP for Macrophage, including the competitive advantage it provided Macrophage in the field of therapeutics.

83.     Macrophage and its Board and officers had a fiduciary duty to preserve the protections Macrophage was afforded for the Improvements in the Sublicense – *i.e.*, the prohibition on Navidea using the Improvements in the field of therapeutics.

84.     In fact, Macrophage signed a Stock Purchase Agreement with Macrophage's preferred shareholders effective as of March 11, 2015 (the same date as the Sublicense) in which it represented and warranted to and contracted with its preferred shareholders that "[a]ny therapeutic

applications of [the Licensed IP] shall be conducted and commercialized through [Macrophage] exclusively . . ..”

**The NIH Grant**

85.     In or about May 2016 Navidea and Macrophage were issued a grant by the National Institutes of Health (the "NIH Grant") to develop diagnostic and therapeutic applications.

86.     Although the grant application was submitted in Navidea's name and awarded in Navidea's name, it contained two distinct components.

87.     One component of the NIH Grant was awarded for the development of diagnostic applications.

88.     This portion of the NIH Grant was applied for and awarded based on research and development work done by Navidea and was designated to fund future research and development of diagnostic applications by Navidea.

89.     The other component of the NIH Grant was awarded for the development of therapeutic applications.

90.     This portion of the NIH Grant was applied for and awarded based on research and development work done by Macrophage and was designated to fund future research and development of therapeutic applications by Macrophage.

91.     In a press release dated May 26, 2016 Navidea stated that "the development activities of the immunotherapeutic platform will be conducted by Navidea and its subsidiary Macrophage Therapeutics," thereby confirming that a portion of the NIH Grant would fund research, development and testing at and by Macrophage.

92.     It was always agreed (and required) that the portion of the NIH Grant allocated to therapeutic research and development would be used by Macrophage to pay its operating expenses and support its work in developing therapeutics, *not* by Navidea.

93.     Thus, in addition to Macrophage's other funding, the NIH Grant represented a significant asset of Macrophage and a significant source of working capital to fund its operations.

94.     When Macrophage and Navidea agreed to completely separate their operations through the August Agreement it was agreed between Macrophage and Navidea that the remaining NIH Grant funding would be allocated among Navidea and Macrophage according to the remaining balances of the NIH Grant amounts allocated to diagnostic and therapeutic research and development respectively.

95.     At the time Navidea terminated the Sublicense based on a purported "insolvency" of Macrophage a significant portion of the NIH Grant's therapeutics funding remained available to fund Macrophage's operations.

96.     In fact, in its Form 10Q for the period ending September 30, 2019 Navidea announced that during the nine-month period ending September 30, 2019 (including the time period after February 19, 2019 on which Navidea asserted that Macrophage was insolvent) Navidea had drawn upon approximately $497,000 of NIH Grant funds.

97.     The portion of this attributable to therapeutics (*i.e.*, the portion allocated to Macrophage's work) would amount to hundreds of thousands of dollars to fund Macrophage's operations in 2019.

98.     Bruck and Rice were aware of this fact because as members of Navidea's board of directors they reviewed and certified Navidea's financial statements.

**Navidea's Funding Obligation**

99.     In the August Agreement Navidea agreed that it would provide the Working Capital Line to Macrophage to fund Macrophage's working capital requirements in an amount up to $750,000 for a period of six (6) months.

100.     Navidea did not fully fund Macrophage's working capital requirements and there were hundreds of thousands of dollars of Navidea's $750,000 commitment unused by Bruck and Rice to fund Macrophage's operations.

**Purported Dismissal of Dr. Green and Appointment of Bruck and Rice to the Macrophage Board of Directors**

101.     Bruck has been a director of Navidea since in or about March 2018.

102.     Rice has been a director of Navidea since in or about 2016.

103.     On or about November 29, 2018 Navidea purported to remove Dr. Green from the Macrophage board of directors and appoint Bruck and Rice as directors of Macrophage.

104.     The validity of the removal of Dr. Green and the appointment of Bruck and Rice to the Macrophage board of directors is one of the issues to be determined in the NY Direct Action.

105.     However, there is no dispute that Bruck and Rice acted as members of the Board beginning on or about November 29, 2018.

**Improper Termination of Sublicense**

106.     On February 19, 2019 Navidea sent a letter to Dr. Goldberg in his role as CEO of Macrophage purporting to terminate the Sublicense effective as of March 11, 2019 on the basis that Macrophage was allegedly insolvent.

107.     In fact, up until that time Navidea had a contractual obligation to extend to Macrophage the Working Capital Line in an amount up to $750,000 to cover Macrophage's working

16

capital needs but Bruck and Rice, at the direction of Navidea, had not drawn fully on the Working Capital Line.

108.    As of February 19, 2019, Macrophage did not have any expenses other than operating costs which Navidea was required to fund through the Working Capital Line.

109.    Had Bruck and Rice required Navidea to comply with its contractual obligations Macrophage would have had no unpaid operating costs at that time.

110.    In addition, Macrophage had the right to significant additional funding provided in the portion of the NIH Grant earmarked for therapeutics.

111.    However Bruck and Rice, at Navidea's direction, did not seek those funds to fund Macrophage's operations.

112.    Navidea had also overcharged Macrophage for certain expenses paid directly by Navidea and charged to Macrophage certain expenses that were actually expenses of Navidea.

113.    In fact, any appearance of insolvency at Macrophage was the result of Bruck and Rice's failure to (i) draw on the Working Capital Line, (ii) seek funding through the NIH Grant funds earmarked for therapeutics, (iii) seek other sources of investment in or funding of Macrophage and/or (iv) address or seek reversal of inaccurate inter-company charges by Navidea including overcharging for Macrophage expenses paid by Navidea and improper allocation of Navidea expenses to Macrophage, all at the direction of and for the benefit of Navidea.

**Purported Dismissal of Dr. Goldberg and Installation of Latkin as Macrophage CEO**

114.    Prior to August 2018 Latkin was Navidea's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO").

115.    Latkin was appointed CEO of Navidea in August 2018 and retained his roles as Chief Financial Officer and Chief Operating Officer.

116.    On or about February 20, 2019 Bruck and Rice, acting as members of the Macrophage board of directors purported to dismiss Dr. Goldberg and install Latkin as CEO of Macrophage.

117.    Latkin continues to serve as CEO, CFO and COO of Navidea.

118.    The validity of the removal of Dr. Goldberg and the installation of Latkin CEO of Macrophage (by Bruck and Rice in their purported capacity as members of the Board) is one of the issues to be determined in the NY Direct Action.

119.    However, there is no dispute that Latkin acted as CEO of Macrophage beginning on or about February 20, 2019.

**Termination of Macrophage Research and Development**

120.    Beginning with the purported appointment of Latkin as Macrophage's CEO on February 20, 2019, Bruck, Rice and Latkin embarked on the second phase of their scheme to loot Macrophage for the benefit of Navidea.

121.    Having, at Navidea's direction, purportedly relegated Dr. Goldberg to a minority of one non-Navidea controlled member on the Macrophage board of directors, and having stripped him of his authority as CEO, Bruck, Rice and Latkin immediately began unwinding Macrophage's promising and valuable research and development projects.

122.    Specifically, Latkin who, in his role as Navidea CEO had delayed payment of many Macrophage research and development costs for which Navidea was responsible to pay directly, immediately began contacting Macrophage's research and development partners and terminating their services.

18

123.     For example, at Navidea's direction, Latkin instructed Dr. Wang to cease all animal testing being performed by Align at NY Medical College, thereby rendering all of the promising data that had been accumulated to date valueless (because the trials could not be completed).

124.     The loss of these animal trials and the resulting invalidation of the research that had been collected already through those trials was a major blow to Macrophage's research and development efforts and caused Macrophage significant damage.

125.     It also set back important and promising research that could have resulted in treatments for humans suffering from various illnesses, including cancer, autoimmune diseases, fatal rare pediatric diseases like Krabbe Disease and IPEX Syndrome.

126.     This also necessitated the unethical euthanatizing of laboratory animals that had been bred with diseases and/or genetic defects for purposes of testing treatments, but now were condemned to suffer and die from those diseases or defects, or be euthanized, all without any scientific purpose or benefit.

127.     By terminating Dr. Green Macrophage lost access to research that was being conducted by Dr. Green at no cost to Macrophage at his laboratory at the University of Pennsylvania.

128.     This also caused Macrophage to lose no-cost access to and use of laboratory resources and equipment valued in the millions of dollars to generate valuable foundational data in connection with Macrophage's efforts to develop cancer treatment drugs.

**Turnover of Macrophage IP to Navidea**

129.     In addition to halting all of Macrophage's valuable and promising research and development, Bruck, Rice and Latkin turned over to Navidea all of Macrophage's valuable Macrophage IP.

130.    As described above, some of the Macrophage IP comprised Improvements on the Licensed IP and therefore if Navidea had legitimately terminated the Sublicense for insolvency – which is not the case – then Navidea would have had the right to utilize Improvements in the field of therapeutics.

131.    However, a large portion of the valuable Macrophage IP did not comprise Improvements but, rather, was independent of the Licensed IP and not dependent on it.

132.    Under no circumstance was Navidea entitled to access to or the use of this portion of the Macrophage IP.

133.    Yet Bruck, Rice and Latkin, at the direction of Navidea turned over *all* of the Macrophage IP to Navidea.

134.    Since Bruck, Rice and Latkin improperly turned over all of the Macrophage IP to Navidea, Navidea has been publicly touting its work in "therapeutics" and has been seeking investment and funding based on its purported therapeutics work.

135.    For example, in a press release dated November 7, 2019 Navidea touted a partnership with IMV, Inc. "to conduct preclinical studies to evaluate the combinatory effect of Navidea's proprietary activated macrophage targeting therapeutics" with certain IMV, Inc. products.

136.    The "proprietary activated macrophage targeting therapeutics" that Navidea is testing in partnership with IMV, Inc. comprise valuable Macrophage IP that was looted from Macrophage by Bruck, Rice and Latkin for the benefit of Navidea and which Navidea has no right to.

137.    Navidea also highlighted the value of the looted Macrophage IP and the partnership it created with IMV, Inc. using the Macrophage IP in an investor call on the same day, November 7, 2019.

138.    Thus, Bruck, Rice and Latkin had succeeded in completing Navidea's scheme to strip Macrophage of its valuable assets all for the sole benefit of Navidea and to the extreme detriment of Macrophage and its shareholders.

**Bruck, Rice and Latkin Breaches of Fiduciary Duty**

139.    Navidea, Bruck, Rice and Latkin engaged in an ongoing course of conduct that involved multiple breaches of their fiduciary duties to Macrophage, all of which was directed by Navidea and engaged in by Bruck, Rice and Latkin at Navidea's direction and for its benefit, all to the detriment of Macrophage.

Failure to Draw on Working Capital Line

140.    Despite the fact that Navidea had a contractual obligation to Macrophage beginning in August 2018 to provide the Working Capital Line up to $750,000 to Macrophage to cover Macrophage's working capital requirements, neither Bruck nor Rice took any actions to draw on the Working Capital Line to pay Macrophage's operating expenses.

141.    Upon information and belief, this was a deliberate course of action decided upon by Bruck and Rice at the direction of Navidea and for Navidea's benefit.

142.    Their failure to draw on the Working Capital Line enabled Navidea to conserve its own limited capital and to re-direct money earmarked to fund Macrophage's working capital requirements for use by Navidea for its own business purposes to the detriment of Macrophage.

143.    Prior to and throughout the time Bruck and Rice were acting as Macrophage directors Navidea had failed and refused to pay Macrophage working capital expenses that Navidea had agreed to pay directly.

144.    Upon information and belief, Bruck and Rice, as directors of Navidea were aware of these failures.

21

145.    Regardless whether they were aware of the exact circumstances of Navidea's failure and refusal to pay Macrophage's operating expenses pursuant to the Working Capital Line, it was their obligation to familiarize themselves with Macrophage's operations and protect Macrophage's interests *vis a vis* both Navidea and Macrophage's creditors.

146.    Bruck and Rice knowingly and intentionally and in bad faith failed or refused to familiarize themselves with Macrophage's operations and obligations.

147.    Bruck and Rice also knowingly and intentionally, and in bad faith and at the direction of Navidea, failed and refused to draw on the Working Capital Line to fund Macrophage's operations.

148.    Upon information and belief, Bruck and Rice failed and/or refused to request or compel Navidea to comply with its obligation to provide working capital to Macrophage to fund its working capital needs because their true loyalty was to Navidea, of which they are long-time directors and which appointed them to the Macrophage board of directors to pursue and protect Navidea's interests, to the detriment of Macrophage.

Failure to Seek the NIH Grant Funding

149.    Despite the fact that Navidea and Macrophage had agreed that the portion of the NIH Grant funding allocated to therapeutics would be used to fund Macrophage's research and development efforts in therapeutics, neither Bruck nor Rice took any actions to obtain access to or cause Navidea to provide those funds to Macrophage.

150.    Upon information and belief, this was a deliberate course of action decided upon by Bruck and Rice at the direction of Navidea and for Navidea's benefit.

151.    Their failure to obtain the NIH Grant funds enabled Navidea to conserve and/or misdirect those funds for its own business purposes to the detriment of Macrophage.

152.    Prior to and throughout the time Bruck and Rice were acting as Macrophage directors Navidea had failed and refused to provide the NIH Grant funds to Macrophage.

153.    Upon information and belief, Bruck and Rice, as directors of Navidea were aware of this failure.

154.    Bruck and Rice knowingly and intentionally, and in bad faith and at the direction of Navidea, failed and refused to demand that Navidea turn over the NIH Grant funding to fund Macrophage's operations.

155.    Upon information and belief, Bruck and Rice failed and/or refused to request or compel Navidea to comply with its obligation to turn over the NIH Grant funding because their true loyalty was to Navidea, of which they are long-time directors and which appointed them to the Macrophage board of directors to pursue and protect Navidea's interests, to the detriment of Macrophage.

Failure to Challenge or Correct Improper Inter-Company Billing

156.    Bruck and Rice also failed to challenge or correct Navidea's improper billing of expenses to Macrophage.

157.    Specifically, Bruck and Rice failed to challenge or correct Navidea's overbilling to Macrophage for Macrophage expenses that Navidea agreed to pay directly.

158.    Bruck and Rice also failed to challenge or correct Navidea's billing of certain Navidea expenses to Macrophage.

159.    These failures had the intent and effect of causing Macrophage's financial circumstances to appear far worse than they actually were.

160.    This was all part of the concerted effort by Navidea, Bruck and Rice to create a pretext upon which Navidea could terminate the sublease based on a purported insolvency at Macrophage that did not exist.

Termination of the Sublicense

161.    Upon information and belief, Bruck and Rice failed and/or refused to request or compel Navidea to comply with its obligation under the August Agreement to provide working capital to Macrophage to fund its operations as part of a concerted plan of action with Navidea to contrive a pretext for Navidea to purport to terminate the Sublicense on the basis of a purported insolvency of Macrophage.

162.    Upon information and belief, Bruck and Rice failed and/or refused to request or compel Navidea to turn over the portion of the of the NIH Grant allocated to therapeutics as part of a concerted plan of action with Navidea to contrive a pretext for Navidea to purport to terminate the Sublicense on the basis of a purported insolvency of Macrophage.

163.    Bruck and Rice did not familiarize themselves with Macrophage's operations, assets, research and development or clinical trials work as was required as part of their fiduciary duty to Macrophage.

164.    Rather, Bruck and Rice took direction from Navidea and took actions dictated by Navidea which put Navidea's interests ahead of the interests of Macrophage.

165.    As a result of Bruck's and Rice's actions and inactions at the direction of Macrophage, Macrophage was left without working capital despite the availability of a Working Capital Line in the amount of $750,000 of which only approximately $400,000 was drawn.

166.    As a result of Bruck's and Rice's actions and inactions at the direction of Macrophage, Macrophage was left without access to the NIH Grant funding earmarked for therapeutics to which Macrophage was entitled.

167.    Bruck and Rice made no effort to familiarize themselves with Macrophage's operations or the valuable Macrophage IP that was being developed through the drug development and production and clinical trials being performed by Macrophage under Dr. Goldberg's direction as CEO.

168.    Bruck and Rice made no effort to raise additional capital for Macrophage, either in the form of debt or equity contributions.

169.    This was done at Navidea' direction as part of a purposeful plan to provide a pretext for Navidea to terminate the Sublicense and thereby obtain an assignment of all of the Macrophage IP and eliminate the prohibition on Navidea's using the Macrophage IP in the field of therapeutics.

170.    The scheme of Navidea, Bruck and Rice was effective in that due to Bruck and Rice's failure and refusal to draw on the Navidea Working Capital Line or demand that Navidea turn over the portion of the NIH Grant allocated to therapeutics, Navidea was able to contrive an alleged insolvency on the part of Macrophage and purport to terminate the Sublicense based on the purported insolvency.

171.    On February 19, 2019 Navidea sent a letter to Dr. Goldberg in his capacity as CEO of Macrophage (the "Termination Notice") notifying Macrophage that Navidea was terminating the Sublicense effective as of March 11, 2019 pursuant to Section 8.1(b)(1) of the Sublicense, which permits Navidea to terminate the Sublicense if Macrophage becomes insolvent.

172.    On the very next day, February 20, 2019, Bruck and Rice, purportedly comprising a majority of the Macrophage board, purported to dismiss Dr. Goldberg as Macrophage's CEO and to install Latkin as CEO.

173.    Once Navidea purported to terminate the Sublicense based on the purported insolvency of Macrophage, Bruck, Rice and Latkin acquiesced in the termination and took no steps to challenge it, even though Macrophage did not have significant current obligations and in any event all current obligations existing at the time the Termination Notice was sent to Macrophage by Navidea should have been paid using the funds available to Macrophage from the Navidea Working Capital Line or the NIH Grant funding allocated to therapeutics.

174.    Bruck, Rice and Latkin did not take any steps to challenge or attempt to reverse the purported termination of the Sublicense.

175.    They aided, abetted and/or acquiesced in the termination which purported to be based on Macrophage's insolvency despite the fact that they were aware long before that time that Navidea was not fulfilling its obligation to fund Macrophage's operating costs, including as required by the Working Capital Line, that Navidea was withholding from Macrophage the portion of the NIH Grant funding allocated to therapeutics and that Macrophage had been overcharged by Navidea for certain expenses paid directly by Navidea and charged for Navidea expenses.

Turn-Over of the Macrophage IP to Navidea

176.    Bruck, Rice and Latkin voluntarily turned over to Navidea not only any Improvements which Navidea would have been entitled to if it had properly terminated the Sublicense based on insolvency (which it did not because Macrophage was not insolvent; Navidea, Bruck and Rice conspired to give the appearance that it was) but Bruck, Rice and Latkin also

26

provided to Navidea *all* of the Macrophage IP, including Macrophage IP which did not comprise Improvements to which Navidea would not be entitled under any circumstances.

177.    This not only destroyed the perpetual competitive advantage that Macrophage was entitled to under the terms of the Sublicense based on the perpetual prohibition on Navidea using any Improvements in the therapeutics field, it also destroyed the value of the competitive advantage Macrophage had based on the non-Improvement Macrophage IP.

Termination of Macrophage Animal Trials

178.    Thereafter, Latkin, acting as Macrophage's CEO, at the direction of Navidea and with the approval and/or encouragement of Bruck and Rice, terminated Macrophage's animal trials and other research and development projects, thereby destroying the value they had already created for Macrophage.

179.    Termination of the Sublicense and of Macrophage's animal testing delayed and called into question Macrophage's ability to complete its efforts to commercialize therapeutic treatments for diseases.

180.    This is especially important to Macrophage because Macrophage was in the process of animal testing therapeutic compounds to treat IPEX Syndrome and rheumatoid arthritis at New York Medical College.

181.    These animal tests were demonstrating promising results.

182.    IPEX Syndrome is deemed an "orphan disease" by the United States Food and Drug Administration (the "FDA") because it affects only a small percentage of the population.

183.    To encourage companies to pursue treatments for orphan drugs the FDA administers a program whereby therapeutic research and development companies that receive FDA approval for

rare pediatric diseases such as IPEX Syndrome receive vouchers that can be used by the holder of the voucher to expedite the FDA approval process for a future drug.

184.    These vouchers are freely tradeable and permit the companies who are awarded the vouchers to sell them.

185.    The vouchers can be sold to other companies who can use the vouchers to expedite their own FDA approval timelines.

186.    At the present time the approximate trading value for a voucher is $125,000,000-$200,000,000.

187.    The animal testing for Macrophage's IPEX Syndrome treatment suggested potential positive results that could lead to FDA approval of clinical trials for the drug.

188.    A company receiving FDA approval for clinical trials for potential treatment for a qualifying orphan pediatric disease, such as IPEX Syndrome becomes eligible for Orphan Disease Pediatric Voucher Designation which assures that if the treatment is eventually FDA approved the company will receive an Orphan Disease Pediatric Voucher.

189.    The significant prospect of obtaining animal testing results that would entitle Macrophage to receive an Orphan Disease Pediatric Voucher Designation from the FDA would generate significant investor interest that would enable Macrophage to continue its research and development efforts.

190.    Similarly, if an Orphan Disease Pediatric Voucher were received by Macrophage the proceeds from the sale of such a voucher would have resulted in a massive influx of capital to Macrophage to fund and expand its operations.

191.    Termination of Macrophage's animal testing by Bruck, Rice and Latkin, at the direction of Navidea, eliminated the possibility that Macrophage would receive an Orphan Disease Pediatric Voucher Designation of an Orphan Disease Pediatric Voucher based on that work.

Turn-Over of Macrophage Equipment to Navidea

192.    In addition to turning over the valuable Macrophage IP to Navidea, Bruck, Rice and Latkin also turned over valuable equipment of Macrophage to Navidea.

193.    Specifically, Bruck, Rice and Latkin permitted Navidea to remove a fluorescent detector used to detect fluorescent molecules administered into laboratory animals by humanely scanning their entire body without surgery.

194.    This equipment had a value of approximately $80,000.

195.    The equipment was removed by Navidea with the approval of Latkin, Bruck and Rice from a laboratory at New York Medical College where it was being used in animal trials being performed for Macrophage and converted to Navidea's own use.

**DEMAND EXCUSED/DEMAND FUTILE**

196.    Both Bruck and Rice are members of Navidea's board of directors and had been directors of Navidea long before they became involved in Macrophage.

197.    Bruck has been a director of Navidea since in or about March 2018 and is paid a significant retainer by Navidea in that role.

198.    Rice has been a director of Navidea since in or about 2016 and is paid a significant retainer by Navidea in that role.

199.    Before November 2018 Bruck and Rice had no direct connection to Macrophage and owed their undivided loyalty to Navidea as directors of Navidea.

29

200.    In November 2018 Navidea purported to remove Dr. Green from the Macrophage board of directors and install Bruck and Rice as its representatives on the Macrophage board of directors.

201.    This was done by Navidea, with the knowledge and agreement of Bruck and Rice so that Bruck and Rice would protect Navidea's interests with respect to Macrophage.

202.    The validity of Bruck and Rice's appointment to the Macrophage board is the subject of the New York Direct Action, however it is undisputed that Bruck and Rice acted as members of Macrophage's board of directors since on or about November 29, 2018.

203.    At the time Bruck and Rice were purportedly appointed to the Macrophage board by Navidea, Navidea was involved in an ongoing dispute with Dr. Goldberg concerning the August Agreement.

204.    Bruck and Rice were well aware of the terms of the August Agreement because they negotiated it on behalf of Navidea and were in discussions with Dr. Goldberg about disputes between Dr. Goldberg and Navidea concerning its implementation.

205.    Bruck and Rice were purportedly appointed to the Macrophage board by Navidea specifically to protect Navidea's interests against Dr. Goldberg.

206.    Bruck and Rice were aware that there was also a dispute about the validity of their appointment.

207.    However, there can be no dispute that Bruck and Rice were placed on the Macrophage board to specifically protect Navidea's interests.

208.    The course of conduct directed by Navidea whereby Bruck and Rice made the conscious decision not to familiarize themselves with Macrophage's operations or operating capital requirements, failed to compel Navidea to fund past-due commitments to Macrophage, failed to

draw on the Working Capital Line to fund Macrophage's ongoing operations and failed to seek Macrophage's portion of the NIH Grant, failed to address or correct Navidea's erroneous inter-company billing to Macrophage and failed to seek additional investment or financing for Macrophage was part of Navidea's scheme to conserve Navidea's own limited funds by avoiding funding the Working Capital Line and keeping for itself all of the remaining NIH Grant funds.

209.    It was also part of Navidea's overall scheme to terminate the Sublicense under false pretenses, terminate the prohibition on Navidea working in the therapeutics field and turn over to Navidea all of the Macrophage IP so that Navidea could immediately use the Macrophage IP as a basis to raise investment funds for Navidea and to improperly compete with Macrophage.

210.    Another aspect of this scheme conceived by Navidea and implemented on Navidea's behalf by Bruck and Rice was their purported appointment of Latkin as Macrophage's CEO and Latkin's conversion to Navidea of a valuable piece of Macrophage equipment and the termination of Macrophage's animal testing operations, all with the encouragement and authorization of Bruck and Rice in their roles as purported Macrophage directors.

211.    All of these acts were intentionally designed by Navidea, Bruck and Rice to strip Macrophage of its assets for the sole benefit of Navidea and to the great detriment of Macrophage.

212.    Evidence of this fact is that Navidea's public filings, which were signed off by Bruck and Rice as directors of Navidea, immediately announced that Navidea had control of Macrophage's intellectual property and testing results and intended to begin work in therapeutics.

213.    Similarly, Navidea's investor presentation in September 2018, even before the scheme had been activated, touted Navidea's work in therapeutics as a key part of the investment thesis presented to potential investors.

214.    Navidea was also able to attract capital investment from a new investor.

215.    Upon information and belief, Navidea's improper acquisition of the Macrophage IP, accomplished through Bruck and Rice (and Latkin) , was a significant factor in Navidea's ability to secure this investment.

216.    In an action pending in the Delaware Court of Chancery captioned *Macrophage Therapeutics, Inc. v. Michael M. Goldberg et al.*, C.A. No. 2019-0137-JRS (the "Delaware Action") the Delaware court entered an order recognizing Bruck, Rice and Dr. Goldberg as all of the members of the Macrophage board of directors commencing on March 13, 2019 and during the pendency of the Delaware Action, or until further order of the Delaware court.

217.    As a majority of the Macrophage board Bruck and Rice have the power to control Macrophage.

218.    There can be no question that Bruck and Rice have, at a minimum, divided loyalty between Navidea, on the board of which they both served (and by which they were  paid) long before they were purportedly appointed by Navidea as Macrophage directors and which is the very entity that made the purported appointment of them to the Macrophage board.

219.    Bruck and Rice's inability to impartially pursue Macrophage's best interest was confirmed when Dr. Goldberg raised certain of the issues addressed herein with the Macrophage board.

220.    As stated herein, by virtue of an order entered in the Delaware Action the board of Macrophage now consists of Dr. Goldberg, Bruck and Rice during the pendency of the Delaware Action or until further order of the Delaware court.

221.    Dr. Goldberg was hopeful that he, Bruck and Rice could address the issues as a board.

222.     Instead, faced with allegations of their own wrongdoing for which they are directly accused of breach of fiduciary duty, without a meeting of the Macrophage board, Bruck and Rice purported to establish a "special committee" comprised solely of themselves, the accused directors.

223.     The "special committee" then engaged the same law firm Bruck and Rice had engaged to sue Dr. Goldberg in the Delaware Action to purportedly "investigate" the allegations of their wrongdoing raised by Dr. Goldberg.

224.     In light of the fact that a dispute exists concerning Bruck and Rice's status as directors of Macrophage and because the law firm engaged by Bruck and Rice to investigate the allegations of wrongdoing raised by Dr. Goldberg is already defending both Bruck and Rice's status as members of Macrophage's board (thereby defending Navidea's conduct in purportedly appointing them) in the Delaware Action and owes loyalty to Bruck, Rice and Navidea, any investigation that may actually be performed by the firm would be a mere sham.

225.     In addition, between July 26, 2019 and the filing of this action there has been no discernable action by Bruck, Rice or their hand-picked law firm to address Dr. Goldberg's complaints.

226.     The foregoing clearly demonstrates that while demand is excused based on Bruck and Rice's lack of disinterestedness in the allegations of this action, which concern their own misconduct at Macrophage, any further demand upon the Macrophage board by Dr. Goldberg prior to filing this action would be futile.

### COUNT I
### Breach of Fiduciary Duty

227.     Dr. Goldberg repeats and realleges the allegations contained in Paragraphs 1 through 226 as if set forth more fully at length herein.

228.     As set forth herein, Bruck and Rice were or were acting as directors of Macrophage.

229.    As set forth herein Latkin was or was acting as CEO of Macrophage.

230.    As a result, Bruck, Rice and Latkin had fiduciary duties to Macrophage to put Macrophage's interests ahead of their own and those of others.

231.    As set forth herein, Bruck, Rice and Latkin put the interests of Navidea, of which they were long-time directors and/or officers and by which they were paid and directed, ahead of the interests of Macrophage.

232.    As a result of the foregoing, Macrophage is entitled to damages from Bruck, Rice and Latkin in an amount to be determined at trial, but not less than $10,000,000.

## REQUESTED RELIEF

WHEREFORE, Dr. Goldberg demands judgment as follows:

(1)    Awarding Macrophage damages in an amount to be determined at trial, but not less than $10,000,000.

(2)    Awarding Macrophage and/or Dr. Goldberg attorneys' fees and costs;

(3)    Awarding Macrophage such other and further relief that this Court deems just and proper.

## JURY DEMAND

Dr. Goldberg respectfully demands a trial by jury on all claims set forth herein.

Respectfully submitted,

/s/ *Gregory Zimmer*
Gregory Zimmer, Esq.
360 Lexington Avenue, Suite 1502
New York, NY 10017
Phone: 914.402.5683
Fax: 914.402.5683
Email: GZimmer@GZimmerLegal.com

LAW OFFICE OF N. ARI WEISBROT LLC

By: /s/ *N. Ari Weisbrot*
N. Ari Weisbrot, Esq.
1099 Allessandrini Avenue
New Milford, New Jersey 07646
Tel: (201) 788.6146
Email:  aweisbrot@weisbrotlaw.com


*Attorneys for Plaintiff Michael M. Goldberg,
M.D., derivatively on behalf of Macrophage
Therapeutics, Inc.*